UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
|     Plaintiff ) | |
| ) | |
| v. ) | CASE NO. 1:05-CR-64 |
| ) | |
| JAMES CHARLES EDWARD SHOALS, IV ) | |
| ) | |
|     Defendant. ) | |

OPINION AND ORDER

This matter is before the Court on a "Motion to Suppress Evidence" filed by the Defendant James Charles Edward Shoals, IV ("Shoals") on December 1, 2005. On January 3 and 5, 2006, the Court held an evidentiary hearing and took the motion under advisement awaiting briefs from the parties. Defendant requested oral argument on his motion along with the filing of his supporting brief on February 17, 2006. The request for hearing was granted on March 10, 2006. The Government filed its response to the motion to suppress on March 17, 2006 to which the Defendant replied on April 6, 2006. Oral argument was then held on April 17, 2006 and, at that time, the Government requested the opportunity to file a supplemental brief to address the case of *United States v. Burton*, 441 F.3d 509 (7th Cir. 2006)[1] cited for the first time by defense counsel during oral argument. That brief was filed on April 21, 2006. Immediately thereafter, Defendant filed an "Objection to Government's Supplement to Brief In Opposition to Defendant's Motion to Suppress" wherein Defendant seeks to strike the Government's brief contending that it did not, as had been

---

[1] As acknowledged by defense counsel during oral argument the *Burton* case does not alter the analysis of this case. Rather, *Burton* merely reaffirms the general principles of prior Supreme Court authorities such as *Terry v. Ohio*. *See Burton*, 441 F.3d at 511-512 (discussing Supreme Court authorities and stating that "the principle that emerges from the cases is that the less protracted and intrusive a search is, the less suspicion the police need in order to be authorized by the Fourth Amendment to conduct it, and vice versa.").

anticipated, address the *Burton* case but was, in substance, an unauthorized sur-reply. For the following reasons, the Defendant's Motion to Suppress will be DENIED and the "Objection to Government's Supplement to Brief In Opposition to Defendant's Motion to Suppress" will be OVERRULED.

## FACTUAL BACKGROUND

Shoals is charged in a single count indictment with a violation of 18 U.S.C.§922(g)(1) (felon in possession of a firearm).[2] This indictment followed Shoals' arrest on April 18, 2005 after officers responded to a report of shots being fired in the vicinity of a residence in which he was present. The present motion to suppress relates to Shoals's detention on the porch of the residence and the search of Shoals's person by police with Shoals contending that police illegally detained him and seized physical evidence based upon the principles set forth in *Florida v. J.L.*, 529 U.S. 266 (2000) and *Terry v. Ohio*, 329 U.S. 1 (1968).

Before turning to the facts of this case, the court must first address the Defendant's filing, which is, in substance, a motion to strike the Government's supplement to its brief in opposition to the motion to suppress. Defendant objects to the Government's supplement claiming that the Government's brief is beyond the scope of what the court authorized when it permitted the Government an opportunity to respond to the new case cited by defense counsel during oral argument. This court disagrees. The case cited by defense counsel sets forth the legal analysis applicable to this case and a review of the Government's filing shows that the Government applied that legal analysis in the *Burton* case to the facts of the present case just as defense counsel did

---

[2] In addition, if convicted of the offense, Shoals must forfeit the firearm at issue and the ammunition for that firearm pursuant to 18 U.S.C. §924(d) and 28 U.S.C. §2461(c).

during his oral argument.  The court concludes that there is nothing improper in the Government's supplement so as to warrant striking the brief from the record.  The Defendant's Opposition to the Supplement is, therefore, overruled.

Next, it is critical to point out that there are minor discrepancies in the testimony of the various officers, most of which the court believes are flaws of memory as opposed to perjurious statements.  Where these discrepancies exist, the court shall note them but, on the whole, the inconsistencies are immaterial to the analysis undertaken here.  Accordingly, after a review of the record, including the exhibits and judging the credibility of the witness, the court concludes by a preponderance of evidence[3] that the facts surrounding Shoals's arrest are as follows:

At approximately 1:00 a.m. on April 18, 2005, Fort Wayne Police Officers Thomas[4] Vachon, Anthony Scatena III ("Officer Scatena"), Michael Epps, ("Officer Epps") and  Ricky Brummett ("Officer Brummett") received a dispatch that shots were fired near the 3900 block of Fairfield and Rudisill.  According to the testimony, Fort Wayne dispatch received this information from an anonymous caller.[5]  The caller provided information which was, in turn, relayed to the officers that the suspect was a black male, wearing a dark coat and a hat, that he was located in the alley near 3927 Fairfield and had fired a "long gun."  Dispatch further reported that the subject had been

---

[3] "The controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock,* 415 U.S. 164, 177-78 n. 14 (1974).

[4] Defense counsel refers to Officer Vachon as Officer **Scott** Vachon in its brief.  The Government refers to Officer Vachon as Officer **Anthony** Vachon in its brief.  When asked at the suppression hearing who he was,  Officer Vachon stated "First name is Thomas, last name is Vachon, V-A-C-H-O-N."  (Tr. day 1 p. 4).  For clarification and absent any evidence to the contrary, the court credits Officer Vachon's testimony that his name is **Thomas** Vachon.

[5] Whether the caller was truly anonymous is debatable.  The officers testified that they were familiar with the caller's identity but did not have any basis to determine whether the caller was reliable until they arrived on the scene.

3

standing near a garage next to a dark blue four door Chevrolet Lumina. He then entered the garage, shut the garage door and appeared to have entered a two story house on Fairfield.

Within a minute or two of receiving the dispatch, Officer Scatena was at the scene and arrived in the alley near the rear garage of the residence located at 3927 Fairfield. Although the caller's name appeared on his in-car computer screen, Officer Scatena did not personally know the caller or whether the caller had provided reliable information in the past. However, at the time Officer Scatena arrived at the scene, the caller was still on the phone with dispatch and notified dispatch that Officer Scatena had arrived in front of the garage where the subject had fled, thereby verifying to Officer Scatena that he was in the location where criminal activity had reportedly occurred. (Tr. II, at 41). Officer Scatena testified as follows:

> When I pulled up in the alley and I stopped my squad car, the caller, the complainant was still – the call taker: He informed the dispatcher that I was parked in front of the garage where this subject had fled to. I then moved my vehicle, for my safety, to the north about 100 feet or so. Then he told us which garage it was, where we were – where the subject had fled to if he hadn't gone into the garage of that residence. He thought he might have gone into that house. So, from that information, officers, along with myself and the other officers, arrived. That is the house that we engaged.

(Tr. II. at 41).

Officers Vachon and Epps arrived at the scene within minutes of Scatena's arrival. Officer Epps remained at the rear of the home while the other two proceeded toward the residence from the east of the house in the alley along the garage. (Tr. II, at 42, 55). Officer Brummett, who had just finished another call, was the last to arrive and met Officers Vachon and Scatena as they proceeded to the front of the house and knocked on the front door. (*Id.*). A black female, presumably the

4

homeowner, answered the door and Officer Scatena[6] informed her that they had received a report of shots fired and that they believed the suspect had entered that home. (Tr.II at 55). A black male was also at the door. While this discussion was ongoing, Officer Brummett testified that he made eye contact with a second male black (Shoals) who appeared to be secreting himself in the kitchen and peering around the corner. (Tr. II at 8). Officer Scatena also observed other persons in the house and then asked all those inside the residence to voluntarily step outside onto the porch. At that time, one black male and at least one black female exited the home.[7] According to Brummett, the black male he witnessed inside the house was initially reluctant to come out onto the porch, and was later ordered out of the house. (Tr. II at 27). Shoals was wearing dark pants and a dark jacket. (Tr. II at 13, 61). The officers then advised the two black males that they were going to conduct a pat-down for officer safety. (Tr.II. at 51: "...it was an officer safety issue. We knew we were dealing with somebody that was possibly armed with a gun, which would be a threat to us or anybody else in the immediate vicinity.").

There is a dispute in the record as to whether the two black males were handcuffed immediately as they stepped onto the porch or whether that occurred at some later point. Officer Vachon indicated that both black males were handcuffed since they fit a very general description of the suspect. (Tr. I at 36). According to Officer Scatena, Shoals was not placed in handcuffs at the time of the patdown, (Tr.II at 57) but had his hands up against the brick wall of the porch while the patdown was conducted. Officer Scatena further testified that Shoals was eventually handcuffed

---

[6]Officers Vachon and Brummett testified that Officer Scatena was the first to speak to the homeowner. Officer Scatena states that it was Officer Vachon that did so. (Tr. II at 55)

[7]It is unclear to the court how many females were in the home. Vachon testifed that one female exited, (Tr. I at 13) while one other officer testified that three females were on the porch. (Tr. II at 76).

after admitting ownership of the Chevy Lumina and prior to being read his *Miranda* rights.  See *infra.*

In any event, Officer Vachon conducted the patdown of Shoals and during that patdown shotgun shells were recovered from Shoals.[8]  Once these items were discovered, the officers inquired about the dark colored Chevrolet Lumina that was in the back since the officers had been advised previously that this was the car from which shots had been fired.  According to Officer Scatena, none of the persons on the porch admitted ownership of the vehicle initially and the other black male indicated that the vehicle did not belong on his property and it could be towed.  Upon hearing this, Shoals voluntarily advised the officers that he had recently purchased the car and that he had keys to the car.

While this was ongoing, Officer Brummett had asked the black female that had answered the door whether she would consent to a search of the residence.  (Tr.II at 9).  The female accompanied Brummett through the home, the yard, and the garage and permitted him to open and look into the two vehicles parked in the garage.  Brummett then inquired about who owned the dark colored Lumina parked in front of the garage.  (*Id.* at 10).  The female indicated that she did not nor did any of the family members residing in the home own the vehicle but indicated that it might be Shoals's vehicle.  *Id.*  At that point, Brummett looked through the windows of the car to see if there were any weapons visible.  After seeing none and noting that the vehicle was still warm, he radioed to the officers at the front of the house and asked them if Shoals had any keys in his possession.  (*Id.* at 11).

---

[8] Whether car keys were removed from Shoals person during this patdown or in a second patdown is in dispute.  Either way, Shoals had car keys for the Chevy Lumina on his person during one of the patdowns.

6

The record appears to reflect that at or around the same time that Brummett was walking through the property, the radio log indicates that Officer Scatena was reading Shoals his *Miranda* rights still at the front of the home at 1:27:30 a.m. When asked why he had been read his rights and was being taken into custody, Officer Scatena responded:

> Well, he had told us several different scenarios. He didn't know anything about the car, then he did. He didn't know anything about any weapons, and then he did. Well, at this point we are going to get to the bottom of this. And he fits the description. He has the keys to a car that nobody knows who it belongs to. He has shotgun shells that miraculously, we don't know how they got there, so we are going to get to the bottom of it. So, before any other questioning occurred, he was read his Miranda rights.

After being read his rights, Shoals indicated he understood them. (Tr. II. at 45). Shoals, pursuant to a request from Brummett, was taken to the rear of the home where the Lumina was located. Officer Brummett used the keys found on Shoals's person to recover a shotgun from the trunk of the Chevy Lumina.

After Shoals was read his *Miranda* rights, Officer Scatena testified that Shoals explained why he had a weapon. He indicated to Officer Scatena that his sister's house had been shot at a few hours earlier that evening and he was angered by this:

> Mr. Shoals ... borrowed the gun and the ammunition and was going to go look for the people that shot up her house and was going to take care of that situation. He didn't elaborate any further than that. He also stated that he obviously didn't find these individuals, came home, was frustrated, and fired a round out of frustration, out of his shotgun.

(Tr. II at 46). Thereafter, Shoals was arrested.

Based upon these facts, the defendant filed the present motion to suppress to which the court turns its attention presently.

## **Discussion**

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. Amend. IV. The amendment does not prevent all encounters between the police and citizens. It comes into play only when a police officer uses physical force or a show of authority to restrain the liberty of a citizen. *United States v. Odum*, 72 F.3d 1279 (7th Cir.1995); *see also United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir.1990) (recognizing three categories of police-citizen encounters: arrest, an investigatory stop, and voluntary encounter with law enforcement).

The key question raised in this case is whether the anonymous tip to police that shots had been fired in the general area of the residence was sufficient under the Fourth Amendment to permit the police to approach the residence, remove the occupants, and patdown the two male black occupants. This is the critical question for if the search violated the Fourth Amendment, evidence retrieved during the patdown and subsequently, the shotgun found in the vehicle which, in turn, led to Shoals's arrest on the present charges must be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963).[9]

---

[9]*Wong Sun* articulated the following with respect to whether evidence seized is fruit of the poisonous tree:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Wong Sun,* 371 U.S. at 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (internal quotation marks and citation omitted). Thus, for evidence discovered after the primary illegality--"derivative evidence"--the question initially is one of "taint." Is the evidence the "fruit of the poisonous tree" because it was obtained by exploiting the Fourth Amendment violation? *See Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Or is it untainted because it stems from a source wholly independent of the constitutional violation? *See Silverthorne Lumber Co. v.*

What is absolutely indisputable in this record is that no probable cause existed to arrest Shoals at the time the officers approached the residence to investigate the report of shots fired. The officers testimony is in agreement that nothing appeared out of the ordinary as they approached the house. There were no spent shotgun shells in the area, no sign of any person matching the description given by the caller, and no evidence (but for the tip) that would have caused a reasonable officer to believe that criminal activity was presently afoot or had been afoot. The defendant then urges the court to go one step further and find that the level of suspicion in this case did not even warrant a detention or patdown of the defendant under the standard set forth in *Terry*. This, however, is where the court disagrees with the defendant's analysis.

According to the facts found by this court, Officer Scatena received information from a Fort Wayne dispatcher that a caller heard shots fired in the exact vicinity where he was located, that the suspect was a black male wearing a dark colored shirt and a hat, that a Chevy Lumina was parked in front of the garage, and that the suspect had, according to the caller, entered the residence at 3927 Fairfield. As Officer Scatena pulled up to the residence, the caller verified that he or she saw the officer and that the officer was in the correct location. Officer Scatena also verified that a Chevy Lumina was parked precisely where the caller had indicated. Once backup arrived, Officer Scatena, Officer Vachon, and, slightly later, Officer Brummett approached the residence where the suspect had allegedly entered. After knocking on the door and speaking to the homeowner, Officer Brummett noted that a black male wearing dark clothing was located in the kitchen and was reluctant to step out onto the porch as all the other occupants had done.

---

*United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969).

Defendant seemingly suggests that because the officers had their weapons unholstered and at the "low-ready" position when they knocked on the door, this is evidence that the house occupants were "seized" or in some manner coerced into exiting the residence. In determining whether an encounter between a private person and the police amounts to a "seizure" for Fourth Amendment purposes, the court utilizes the objective standard articulated by the Supreme Court:

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Florida v. Bostick*, 111 S.Ct. 2382, 2386 (1991)). Thus, the law is well established that "if, in the totality of the circumstances, a reasonable person would not believe that his freedom of movement was restrained, or believes that he remains at liberty to disregard a police officer's request for information, a seizure has not occurred." *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir.1990) (quoting *United States v. Espinosa-Alvarez*, 839 F.2d 1201, 1205 (7th Cir.1987)).

Here, the facts simply do not support an assertion that a seizure of any of the occupants of the home occurred at the time they were asked to step onto the porch. True enough, all of the officers who approached the front door indicated that considering the nature of the investigation, they had their weapons unholstered and at the low-ready position. These same officers testified that when they spoke to the person answering the door, they explained to her the reason for their presence on her property and asked her and the others if they would voluntarily exit the residence and come onto the porch. There is no evidence that any of the house occupants felt intimidated or coerced into stepping onto the porch. Rather, the opposite appears true since this court has credited Officer Brummett's testimony that the homeowner voluntarily engaged in conversation

with the police and consented to having Officer Brummett walk through her home, her garage and inspect the vehicles in the garage. Thus, the court concludes that no seizure of the defendant or anyone else at the residence occurred simply by being asked to step onto the porch.

There was, however, a seizure of the two black males once they were handcuffed, if they indeed were (it matters little in the analysis as demonstrated below) and patted down for officer safety pursuant to *Terry*. Under *Terry*, a person may be stopped/detained for brief questioning and a pat-down search without a warrant if the officer can point to "a reasonable suspicion of criminal activity." "'Reasonable suspicion' is 'a quantum of proof less demanding than probable cause'...but a 'hunch' will not suffice....There must be 'some minimal level of objective justification for making a stop.'...The officer must be able to set forth 'specific and articulable fact' which, based on 'the totality of the circumstances--the whole picture,' are 'sufficient to give rise to [the] reasonable suspicion' of criminal activity..." *United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999). A court is to take into account the entire set of circumstances surrounding the stop in determining whether the same violated *Terry*. That is, "the whole picture must be taken into account in determining whether the police are justified in conducting a *Terry* stop, including the inferences and deductions made by a trained police officer." *United States v. Thornton*, 197 F.3d 241, 248 (7th Cir. 1999). "Circumstances which appear innocent to the outside observer may suggest criminal activity to experienced law enforcement personnel who may assess these circumstances in light of their experience." *Id.*

Here, the facts reflect that the officers had been informed by dispatch of the following: (1) shots had been fired from a "long gun"in the 3900 block of Fairfield and Rudisill; (2) the subject was a black male wearing dark clothes and a hat; (3) a dark Chevy Lumina was parked outside the

garage of a residence where the shots had been fired; (4) the subject was seen possibly entering this residence.  In addition to this information, when the officers were speaking with the homeowner, one of them observed a black male wearing dark clothes appearing to secrete himself in the kitchen.  This individual did not respond as quickly as the other occupants to the request to come onto the porch and had to be specifically addressed.  Given all of these facts and circumstances, it certainly was reasonable for the officers to perform a protective frisk of the two black males, one of whom matched the description provided by the caller and who police had observed acting suspiciously.  In fact, at this point and given the nature of the investigation, it would have been reasonable for the officers to place the two black males in handcuffs while their investigation was ongoing.  *See United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) ("Neither does handcuffing in all circumstances transform a stop into an arrest.  In fact, handcuffing-once highly problematic-is becoming quite acceptable in the context of a *Terry* analysis.").  Indeed, "the mere use or display of force ...not necessarily transform a stop into an arrest if the surrounding circumstances give rise to a justifiable fear for personal safety. " *Id.* (listing cases where it was permissible for officers to approach subjects under *Terry* with guns drawn, or to order them to lie prone on the ground, or to handcuff suspects where officer safety required such measures).

      Certainly there may be cases where the facts, even under similar circumstances may not warrant a protective frisk or amount to reasonable suspicion so as to permit a subject's detention or patdown.  For instance, a situation might arise where no suspicious behavior is observed or where certain portions of an anonymous caller's information are not verified by officers arriving on the scene so as to put the officers in a position of having a mere hunch that criminal activity

12

was afoot; rather than an articulable suspicion as required by *Terry*. But, that is not this case. The intrusion on the liberty of the citizens here was *de minimis* as compared to the potential risk to the officers had one of the two black males (one of whom had attempted to secrete himself prior to exiting the home and who matched the description of the suspect) possessed a weapon. "To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry v. Ohio.*" *United States v. Maslanka,* 501 F.2d 208, 213 n. 10 (5th Cir.1974), *cert. denied,* 421 U.S. 912 (1975). Accordingly, the court concludes that the patdown of the defendant was reasonable and wholly within the bounds of a *Terry*-type protective frisk.[10]

The defendant has not argued that the police lacked probable cause to arrest him once they located shotgun shells in his pocket, the keys to the Chevy Lumina (to which he admitted ownership), and the shotgun in the trunk. Nor does Defendant assert that a violation of *Miranda v. Arizona* occurred so as to make his statements to police invalid. Defendant does make a cursory and unpersuasive argument that because the evidence is inconsistent as to how the car keys were retrieved from Shoals there was something unlawful about their retrieval; but, in substance, it matters little whether the keys were discovered during the legal patdown of Shoals or in some

---

[10]The defendant does not assert that the frisk itself was beyond the scope of the type of what is a lawful *Terry* patdown and the facts do not support such an argument. In *Minnesota v. Dickerson,* 508 U.S. 366, 377 (1993), the Supreme Court concluded that a police officer may seize contraband detected by sense of touch during a protective patdown search so long as the officer is acting within the bounds of *Terry* at the moment when probable cause arises to believe that contraband is present:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Id.* at 375-76, 113 S.Ct. at 2136-37. Here, the patdown appears to be in line with *Dickerson*.

13

other manner.  The homeowner told police that the vehicle did not belong at the residence and authorized them to tow it.  Even absent the admission by Shoals that he owned the vehicle and had the keys, an inventory of the vehicle once it was towed would have yielded the shotgun and given the police probable cause to believe that the person at the residence with the shotgun shells in his pocket owned the vehicle, gun or both.  Accordingly, the court finds nothing unlawful relating to the retrieval of the shotgun from the Lumina.

## CONCLUSION

In sum, the court concludes that the officers conducted a lawful protective frisk of the defendant in accordance with the Fourth Amendment and *Terry*.   The Defendant's Motion to Suppress is therefore DENIED.  The Defendant's objection to the  Government's Supplement to its brief in opposition to the motion to suppress is OVERRULED.

Entered: This 23rd day of May, 2006

    s/  William C. Lee, Judge
    United States District Court
    Northern District of Indiana